THE HONORABLE RICHARD A. JONES

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

PATRICIA BUTLER AND WESLEY BUTLER, on behalf of themselves and all other similarly situated employees,

Plaintiffs,

v.

HARVEST MANAGEMENT SUB, LLC d/b/a HOLIDAY RETIREMENT,

Defendant.

No. 2:17-cv-00685-RAJ

**DECLARATION OF MICHELE STONE IN SUPPORT OF DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR CONDITIONAL CERTIFICATION OF AND NOTICE TO FLSA COLLECTIVE**

I, Michele Stone, hereby declare as follows:

1. I have personal knowledge of the matters stated herein, and if called to testify as to those matters, I could and would testify competently.

2. I work for Holiday Retirement ("Holiday" or the "Company") as General Counsel. I have held this position since April 2015. Prior to that date, I was Associate General Counsel of the Company.

3. I have reviewed data that the Company and its communities maintain in the ordinary course of business. In particular, I reviewed data regarding Co-Managers who worked for the Company on or after January 26, 2015 and the communities they managed, as well as summaries of that data (the "Co-Manager Data Set").

### Holiday Communities

4. Holiday is one of the largest providers of senior living communities in North America. Based on my review of the Co-Manager Data Set, Holiday has operated close to 285

senior living communities in which Co-Managers worked. Those communities are spread across 43 states.

5. Some states have many communities, others only a few. For example, based on my review of the Co-Manager Data Set, Holiday has operated approximately 35 communities in California, 31 in Texas, 14 in Oregon, 8 in Michigan, and 12 in Colorado since January 26, 2015. In other states, Holiday has operated only a few communities, such as Maine (3), Montana (3), Nevada (3), Pennsylvania (6), Utah (5), and Virginia (6). Florida, Washington, and North Carolina have accounted for approximately 20, 16, and 14 communities, respectively.

6. Holiday communities vary in many ways. For instance, communities vary in size. The largest Holiday community could accommodate up to approximately 700 residents, while the average community houses around 100 residents. Some communities are physically much larger than others or may have particular facilities (e.g., a pool or gym), and thus require more maintenance and housekeeping staff. Some larger communities have two kitchens requiring more food preparation and food service staff.

7. The differences among each particular community affect operations in various ways. Bigger communities generally require more hourly employees. Depending on its size, at any given time a community may employ anywhere from approximately 15 to 25 hourly employees across housekeeping, foodservice, maintenance, transportation, resident enrichment, and other roles. These employees are directly supervised by the on-site management team, which until the position's elimination included Co-Managers.

8. Turnover among hourly employees also varies by location depending on various factors, such as the labor market in which the community sits. In communities with higher turnover rates, community managers would need to spend more time recruiting, hiring, training, and supervising new employees. Also, in higher-turnover communities, the management team at certain points might need to perform some tasks normally performed by hourly employees

(while also performing their management duties) more often than managers would have to do so in low-turnover communities and areas.

### Holiday Regional Management Structure

9. Each community falls within a defined region, which is overseen by a Regional Director. With some variations over time, Holiday generally divides its communities among 25 or so regions. Although each is unique and the composition of each one changes from time-to-time, a Regional Director might have 10 to 13 communities in his or her region at any given time. Some regions consist predominantly of communities all in one state, such as a large state like California or Texas where Holiday operates many facilities. Other regions are comprised of communities spread across several states in which we operate only a few facilities, such as states in the Midwest or Northeast parts of the United States.

10. Each Regional Director has discretion for high-level oversight of the communities in their region.

### Co-Manager Role and Responsibilities

11. I am familiar with the Co-Manager position and its prior function in Holiday communities. The management and supervisory role of the Co-Manager job are summarized in Holiday's Co-Manager Job Description, which was attached to my prior declaration, dated November 3, 2017. In that declaration, I testified about various documents reflecting the individual ways Opt-Ins executed their management and supervisory responsibilities. That testimony is incorporated here by reference.

12. Each community had discretion to establish work schedules for Co-Managers and Lead Managers. On days when Lead Managers (who worked as a team) were not scheduled, the Co-Managers would be scheduled (and vice versa). Likewise, in many communities, on nights when Lead Managers were not scheduled to be "on-call," the Co-Managers would be "on-call" (and vice versa). Thus, Co-Managers and Lead Managers often worked "opposite" schedules, with some overlap in a given week, so that either Co-Managers or Lead Managers would always be responsible for managing the community.

## Opt-In Plaintiffs

13. Based on my review of the Co-Manager Data Set, Holiday employed approximately 720 Co-Managers during the two years preceding January 26, 2018 (or, for Plaintiffs and the Opt-Ins, two years prior to their respective opt-in dates). Within the three-year period preceding January 26, 2018, Holiday employed approximately 1,242 Co-Managers (or, for Plaintiffs and the Opt-Ins, two years prior to their respective opt-in dates).

14. Based on my review of the Co-Manager Data Set, as well as the Opt-In Plaintiffs' sworn declaration testimony regarding their respective employment history, Plaintiffs and the Opt-Ins worked as salaried Co-Managers in about 18 of our approximately 300 communities that operated during this period. The Plaintiffs and Opt-Ins who submitted declarations worked as salaried Co-Managers in ten of those communities.

15. I have reviewed HR and payroll records relating to Opt-In Michael and Nina Sykes. These records reflect that each was classified and paid as nonexempt employees for the period from May 4, 2014 through December 14, 2014. They were not working as salaried exempt Co-Managers during that period. Based on the previously mentioned records, they never worked in that capacity in Connecticut, Colorado, New York, or New Hampshire.

16. Based on my review of the Co-Manager Data Set, the following nine Opt-In Plaintiffs' last dates of employment as a Co-Manager are as follows: Chad Baker: June 27, 2015; Jessica Baker: June 21, 2015; Patricia Butler: November 30, 2014; Wesley Butler: November 30, 2014; Anne Hornback: March 2, 2015; Daniel O'Connell: March 2, 2015; Philip Sinclair: June 11, 2015; Michael Sykes: August 16, 2015; Nina Sykes: August 16, 2015.

## Holiday Arbitration Program

17. I am familiar and involved with Holiday's arbitration program, and I am familiar with how new employees acknowledge Holiday's arbitration agreement. My testimony about Holiday's arbitration program and agreement in my November 3, 2017 declaration is incorporated here by reference.

18. As explained in my earlier declaration, individuals who were already employed by Holiday as of December 2013 had an opportunity to opt out of the arbitration program. Based on data that Holiday maintains in the usual course of business, the only Plaintiffs or Opt-Ins in this case who returned an opt-out form by the January 6, 2014 deadline were Named Plaintiffs Patricia and Wesley Butler.

19. As explained in my prior declaration, as part of the new hire onboarding process, employees hired after September 2013 were presented with a version of the Holiday arbitration agreement that did not include an opt-out form. Opt-Ins Chad Baker, Melanie Baker, Scott Randall, Phillip Sinclair, and Shawn Smith were all hired after September 2013. They therefore were presented with the agreement for signature during or shortly after on-boarding. Each of these individuals returned a signed agreement. (*See* Exhibit A, Agreement executed on Aug. 30, 2015 by Chad Baker; Exhibit B, Agreement executed on Aug. 30, 2015 by Melanie Baker; Exhibit C, Agreement executed on Mar. 12, 2015 and Apr. 7, 2015 by Scott Randall; Exhibit D, Agreement executed on Apr. 21, 2014 by Phillip Sinclair; Exhibit E, Agreement executed on Aug. 26, 2014 and Jan. 25, 2015 by Shawn D. Smith.)

20. Based on my familiarity and involvement with Holiday's arbitration program and my review of the Co-Manager Data Set, nine of the approximately 720 individuals employed by Holiday as Co-Managers on or after January 26, 2015 (or, for Plaintiffs and the Opt-Ins, two years prior to their respective opt-in dates) opted out of the arbitration program. The remaining individuals either executed an arbitration agreement or, if they were hired in or before September 2013, did not return an opt-out form. Similarly, of the approximately 1,242 persons employed as Co-Managers since January 26, 2015 (or, for Plaintiffs and the Opt-Ins, three years prior to their respective opt-in dates), 17 opted out, and the remaining individuals either executed an arbitration agreement or, if they were hired in or before September 2013, did not return an opt-out form

### Holiday's Contact Information Records for Former Co-Managers

21. I am familiar with Holiday's recordkeeping practices with respect to current and former employees.

22. Until the position's elimination, Co-Managers lived in the community that they managed and used community phone numbers and work email accounts. To the extent that Holiday asked for their personal phone number or email address, the Company maintained such data in their respective personnel files and did not systematically upload the data in any searchable way. Stated differently, to collect each former Co-Manager's personal phone number and/or personal email address would require a person-by-person search of their personnel files.

I declare under penalty of perjury that the foregoing is true and correct. Executed on January 16, 2018.

By: _____
Michele E. Stone

# CERTIFICATE OF SERVICE

On January 16, 2018, I caused to be served upon counsel of record, at the address stated below, via the method of service indicated, a true and correct copy of the following document(s):

**DECLARATION OF MICHELE STONE IN SUPPORT OF DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR CONDITIONAL CERTIFICATION OF AND NOTICE TO FLSA COLLECTIVE**

| | | |
|---|---|---|
| Alan L. Quiles | ☐ | Via Hand Delivery |
| Gregg I. Shavitz | ☐ | Via U.S. Mail, 1st Class, Postage Prepaid |
| Shavitz Law Group, P.A. | | |
| 1515 South Federal Highway, Ste. 404 | ☐ | Via Overnight Delivery |
| Boca Raton, FL 33432 | ☐ | Via Facsimile |
| Telephone: (561) 447-8888 | ☒ | Via E-filing |
| Facsimile: (561) 447-8831 | | |
| Email: aquiles@shavitzlaw.com | | |
| gshavitz@shavitzlaw.com | | |

*Attorneys for Plaintiffs*

| | | |
|---|---|---|
| Adrienne McEntee | ☐ | Via Hand Delivery |
| Jennifer Rust Murray | ☐ | Via U.S. Mail, 1st Class, Postage Prepaid |
| Beth E. Terrell | | |
| Terrell Marshall Law Group PLLC | ☐ | Via Overnight Delivery |
| 936 N. 34th St., Ste. 300 | ☐ | Via Facsimile |
| Seattle, WA 98103 | ☒ | Via E-filing |
| Telephone: (206) 816-6603 | | |
| Facsimile: (206) 350-3528 | | |
| Email: amcentee@terrellmarshall.com | | |
| jmurray@terrellmarshall.com | | |
| bterrell@terrellmarshall.com | | |

*Attorneys for Plaintiffs*

I certify under penalty of perjury under the laws of the State of Georgia that the foregoing is true and correct. Dated at Atlanta, Georgia, this 16th day of January, 2018.

By: *s/ Brett C. Bartlett*
Brett C. Bartlett